

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-16-1999

# East Wind Ind Inc. v United States

Precedential or Non-Precedential:

Docket 99-5116

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"East Wind Ind Inc. v United States" (1999). *1999 Decisions.* Paper 303.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/303

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 16, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5116

EAST WIND INDUSTRIES, INC.;
DELAWARE EAST WIND, INC.

v.

UNITED STATES OF AMERICA

(District of New Jersey (Trenton) Civil 97-2615)

DELAWARE EAST WIND, INC.

v.

UNITED STATES OF AMERICA

(District of New Jersey (Trenton) Civil 97-2617)

(East Wind Industries, Inc.,

     Appellant

Appeal from the United States District Court
for the District of New Jersey
District Judge: Honorable Mary Little Cooper

ARGUED
September 13, 1999

Before: MANSMANN, McKEE and STAPLETON,
Circuit Judges.

(Filed November 16, 1999)

Lowell E. Mann, Esquire (Argued)
Gretchen S. Kolb, Esquire
Mann Law Associates
One Oxford Valley
Suite 850
Langhorne, PA 19047

 COUNSEL FOR APPELLANT

Loretta C. Argrett
 Assistant Attorney General
Kenneth L. Greene, Esquire
Jeffrey R. Meyer, Esquire (Argued)
United States Department of Justice
Tax Division
P.O. Box 502
Washington, DC 20044

Of Counsel:

 Faith S. Hochberg
 United States Attorney

 COUNSEL FOR APPELLEE

OPINION OF THE COURT

MANSMANN, Circuit Judge:

This appeal arises out of a judgment of the United States District Court for the District of New Jersey granting the Government's motion for summary judgment and denying the Taxpayers' cross-motion for summary judgment in their action seeking a refund of tax penalties. The Taxpayers contended before the District Court, as well as on appeal, that reasonable cause existed for the late payment and deposit of employment taxes under 26 U.S.C. #8E8E # 6651(a)(2) and 6656(a), respectively and, therefore, they are entitled to an abatement of the penalties assessed under those provisions. The District Court, relying on the bright line test set forth in Brewery, Inc. v. United States, 33 F.3d 589 (6th Cir. 1994), that financial difficulties alone can never constitute reasonable cause for abatement of a penalty assessed pursuant to sections 6651 and 6656 of the

2

Internal Revenue Code, concluded that reasonable cause was not established by the Taxpayers because financial distress was the only fact and circumstance supporting their failure to pay and deposit employment taxes timely.

Because we believe the Brewery bright line test is inconsistent with both Congress' creation of a reasonable cause exception and Treas. Reg. S 301.6651-1(c)(1), we find that the District Court erred as a matter of law in adopting the bright line rule in Brewery. We believe the better reasoned approach is the one set forth in Fran Corp. v. United States, 164 F.3d 814 (2d Cir. 1999), which requires us to examine all the facts and circumstances of the Taxpayers' financial situation. After reviewing all of the facts and circumstances, we have concluded that reasonable cause existed for the Taxpayers' failure to pay and deposit their employment taxes timely. Thus, we will reverse the judgment of the District Court and enter judgment for the Taxpayers.

I.

The following facts are undisputed and have been largely stipulated to by the parties. East Wind Industries, Inc. ("East Wind") and Delaware East Wind, Inc. ("Delaware East Wind") (collectively referred to as the "Taxpayers") were incorporated under the laws of Delaware in 1966. At all relevant times, East Wind manufactured military clothing and goods for sale to the United States Department of Defense ("USDOD"). From 1982 through 1986, Delaware East Wind operated as a holding company that owned the manufacturing plant of East Wind. Consequently, East Wind paid rents to Delaware East Wind for the manufacturing plant. Delaware East Wind began to bid on government contracts when East Wind ceased operations in 1986. All business activities of the Taxpayers were controlled by Mario D'Antonio, Vice-President of East Wind.

The Taxpayers manufactured the military clothing and goods for purchase by the federal government through its Defense Personnel Support Center ("DPSC"), and the Defense Contract Administration Services ("DCAS") agency administered the contracts.1 Both DPSC and DCAS are

_____

1. The DPSC is the Defense Department supply center located in Philadelphia, Pennsylvania, responsible for the purchase and

3

branches of the Defense Logistics Agency ("DLA")
(collectively referred to as the "Defense Agencies"). All of the
Taxpayers' contracts went through these Defense Agencies.
Any other defense departments for whom the Taxpayers
could have manufactured goods were administratively
handled by DCAS.

From 1966 through 1981, East Wind had a 15-year
history of obtaining and completing government contracts.
During that same period, the Taxpayers had a history of
timely filing payroll tax returns and paying their
withholding taxes. Beginning with the tax period ending
June 30, 1982, through the tax period ending December
31, 1986, (the "periods in question"), East Wind timely filed
all of the appropriate tax returns but failed to pay its
employment withholding taxes when such taxes became
due and owing. Beginning with the tax period ending
December 31, 1986, through the tax period ending June
30, 1988, (the "periods in question"), Delaware East Wind
timely filed all of the appropriate tax returns but failed to
pay its employment withholding taxes when such taxes
became due and owing. The Taxpayers ultimately paid their
delinquent employment taxes in full and certain penalties
owing to the Internal Revenue Service ("IRS" or "Service")
pursuant to a reorganization plan approved by the
Bankruptcy Court.2

As early as 1976, certain employees at the Defense
Agencies began soliciting illegal bribes from the Taxpayers.
Initially, these bribes were in the nature of certain favors to
be provided by the Taxpayers, such as assisting an
employee of the Defense Agencies in obtaining a mortgage
or in gaining admittance to a certain school for a son or

_____

distribution of food, clothing and medical supplies for the armed forces
of the United States. The DCAS is responsible for contract management,
quality assurance and financial management of contracts awarded by
USDOD supply centers, such as DPSC. As part of its responsibilities,
DCAS oversees the performance of contracts to assure compliance with
contract terms and USDOD regulations through a network of regional
offices and management areas.

2. The parties disagree as to the exact amount of the penalties paid by
the Taxpayers. This issue is irrelevant for purposes of this appeal.

daughter. Eventually, the bribes being solicited took the form of monetary compensation. The amount demanded by these corrupt employees amounted to 50% of the Taxpayers' business. When the Taxpayers declined to pay the bribes, they did not receive new contracts from the Defense Agencies unless they were the only bidder on a particular contract. As a result of refusing to pay the illegal bribes to the corrupt employees of the Defense Agencies during the periods in question, (1) the Taxpayers were not paid monies due and owing to them for work which was successfully performed and for goods delivered to and accepted by the Defense Agencies; (2) payments were intentionally and substantially delayed; (3) inventory was wrongfully rejected and (4) orders were required to be reworked according to the "trumped up" false specifications of the government inspectors. The Defense Agencies did, however, make some contract payments to the Taxpayers after they refused to pay the bribes. Moreover, the Taxpayers were awarded some additional contracts by the Defense Agencies during this time period, but only when the other companies who were paying off the corrupt employees had not bid on the contract.

The Taxpayers attempted to put a stop to the bribery activities of the Defense Agencies' employees by contacting the DPSC legal staff in August, 1984, the Commanding Officer, DCASMA -- Philadelphia, in August, 1983, Quality Assurance -- DCASR, and their Congressman. The Taxpayers expected that in doing so, they would mitigate the negative economic effect on their business. Unfortunately, the Taxpayers' expectations were unrealistic.

East Wind's Vice-President Mario D'Antonio consulted with several professionals regarding financial and legal concerns in light of the bribery and cash flow problems. In particular, he consulted with accountants regarding such matters as cash flow, payables, cash conservation, payroll, personal loans and payment of taxes. He also consulted with attorneys regarding such legal matters as the collection of receivables, forwarding claims against the government, analyzing legal strategies to maintain the company, debtor's rights, and legal responsibility for taxes. D'Antonio also consulted with other manufacturers to learn

how they responded to the bribery demands in order to determine how to proceed with the Taxpayers' business given the illegal action of the employees of the Defense Agencies. Moreover, D'Antonio and his wife took out numerous personal loans, including a mortgage on their personal residence, to provide additional cash to pay essential employees, those creditors who were threatening to cut off their services, or to pay some of the payroll taxes.

As a consequence of the Defense Agencies' actions in response to the refusal to pay the illegal bribes, the Taxpayers sustained monetary damages in an amount in excess of $5.1 million. Subsequently, the Taxpayers asserted claims against the Defense Agencies to recoup their damages.3 In addition, the Taxpayers brought tort claims against the Defense Agencies.

In 1984, East Wind and Delaware East Wind filed separately for protection under Chapter 11 of the Bankruptcy Code. During the periods in question, Delaware East Wind timely filed its payroll tax returns but continued to accrue employment tax liabilities until it ceased operations in 1988. The claims register in the Bankruptcy Court substantiates that the Taxpayers had not been paying amounts owed to their suppliers and other creditors during the periods in question.

The certified public accountant ("CPA") appointed by the Bankruptcy Court noted that the cash flow of a company such as the Taxpayers' is essentially within the inventory. Inventories in the amount of $750,000, which had been wrongfully rejected by the Defense Agencies, remained in the Taxpayers' warehouse.4 The CPA found that the Taxpayers' employees were compensated on an hourly basis at little more than the minimum wage and, without that

_____

3. Claims made by the Taxpayers against the Defense Agencies included matters brought before the Armed Services Board of Contract Appeals ("ASBCA"). One such dispute arose between the parties with regard to an unexecuted written settlement agreement concerning the claim, which agreement was enforced against the Government by the Bankruptcy Court.

4. The inventory was eventually reworked by the Taxpayers for which they received payment.

pay, would have left the Taxpayers' employ. In the CPA's opinion, the Taxpayers would have had to shut down operations without these employees. Nonetheless, between 1982 and 1988, D'Antonio had to lay off a substantial number of employees because the Taxpayers were not being awarded any new contracts. The reduction in employees was reflected in the payroll tax returns for the successive periods.

Late in 1984, D'Antonio was approached by the Federal Bureau of Investigation ("FBI") and was asked to cooperate in an investigation of the corrupt employees of the Defense Agencies. D'Antonio went undercover for the FBI in 1985 in order to gather information on the Defense Agencies' employees involved in the bribery scheme and worked with the FBI for a period of two years. During this time, the FBI instructed the Taxpayers when to pay and when not to pay bribes to top-ranking employees of the Defense Agencies. Moreover, D'Antonio withdrew the Taxpayers from competitive bidding on DPSC procurements which were tainted by corrupt DPSC contractors and their consultants in order to expose this criminal misconduct. D'Antonio's cooperation with the FBI far exceeded the Initial Memorandum of Understanding as to his participation in the undercover investigation. For his part in the illegal procurement activities, D'Antonio pled guilty to two counts of violating the False Claims Act, 18 U.S.C. S 287. He paid $2,000 in fines but was not sentenced to a period of incarceration.

A global settlement agreement was reached between the Taxpayers and the Defense Agencies as a result of the Bankruptcy Court's enforcement of the Taxpayers' claims against the Defense Agencies. The Taxpayers received a total of $2.1 million from the Defense Agencies, $1.3 million of which was paid to East Wind and $800,000 of which was paid to Delaware East Wind. Out of this settlement, which was administered by the Bankruptcy Court, the Taxpayers paid all of the outstanding employment taxes, as well as penalties and interest, to the IRS.

Thereafter, the Taxpayers commenced this suit in the District Court seeking a refund of the penalties assessed and paid on the delinquent employment taxes. The

Taxpayers alleged they were entitled to an abatement of the penalty because the delinquency was due to reasonable cause and not due to willful neglect. The matter was submitted to the District Court on cross-motions for summary judgment. On January 15, 1999, the District Court granted summary judgment in the Government's favor and dismissed the Taxpayers' summary judgment motion as moot. See East Wind Industries, Inc. v. United States, 33 F.Supp.2d 339 (D. N.J. 1999).

The Taxpayers filed this timely appeal. We have jurisdiction pursuant to 28 U.S.C. S 1291.

II.

The issue before us is whether the District Court erred in applying the bright line test set forth in Brewery, Inc. v. United States, 33 F.3d 589, 592 (6th Cir. 1994), that financial difficulties per se can never constitute reasonable cause for abatement of a penalty assessed pursuant to sections 6651 and 6656 of the Internal Revenue Code, in light of the pertinent statutory language and Treasury Regulations thereunder. If we determine that the District Court erred in applying the Brewery standard, then we must also consider whether, based upon all the facts and circumstances, the Taxpayers' failure to pay their employment taxes timely was due to reasonable cause and not willful neglect pursuant to sections 6651 and 6656 of the Internal Revenue Code and the Treasury Regulations thereunder.

We exercise de novo review over the District Court's order granting the Government's motion for summary judgment. Greenberg v. United States, 46 F.3d 239, 242 (3d Cir. 1994) (citing United States v. Carrigan, 31 F.3d 130, 133 (3d Cir. 1994)). De novo review requires us to apply the same test used by the District Court, "namely, whether there is `no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " Tolchin v. Supreme Court of the State of New Jersey, 111 F.3d 1099, 1106 (3d Cir. 1997) (quoting Fed.R.Civ.P. 56(c)) (other citation omitted). Thus, we must review all of the facts and inferences in the light most favorable to the

8

Taxpayers in order to determine whether there is a genuine issue of material fact. Greenberg, 46 F.3d at 242. If we find that no genuine issue of material fact remains, then we must determine whether the Government is entitled to judgment as a matter of law. Id.

A determination of the elements required to prove that failure to pay employment taxes was due to reasonable cause is a question of law subject to plenary review. United States v. Boyle, 469 U.S. 241, 249 n. 8 (1985) (citations omitted). Whether the required elements are present in a particular case is a question of fact which we review for clear error. Id.

A.

Under sections 6651(a)(1), (a)(2) and 6656(a) of the Internal Revenue Code of 1986, as amended (the "Code" or "IRC"), the Service imposes mandatory penalties for the failure to file returns, pay taxes, or deposit employment taxes in a government depository unless the taxpayer can show that such failure was due to "reasonable cause" and not due to "willful neglect." Thus, to succeed in obtaining an abatement of penalties imposed under sections 6651 and 6656, the taxpayer bears the heavy burden of establishing that (1) the failure did not result from "willful neglect," and (2) the failure was "due to reasonable cause." United States v. Boyle, 469 U.S. 241, 245 (1985) (citing IRC S 6651(a)(1)). Neither "willful neglect" nor "reasonable cause" is defined in the Code.

A definition of "willful neglect" was provided by the Supreme Court in Boyle, which found that the phrase "willful neglect," as used in section 6651(a)(1), had been construed over the years to mean "a conscious, intentional failure or reckless indifference."5  Id. (citations omitted).
_____

5. The Court's analysis in Boyle addressed penalties for failure to file tax
returns under section 6651(a)(1). The language concerning the standard for failure to file a return is identical to the language in sections 6651(a)(2) and 6656 for failure to pay and to deposit. We see no reason why the Court's analysis under section 6651(a)(1) should not guide our analysis of sections 6651(a)(2) and 6656.

9

Stated another way, the taxpayer must show that the failure to file a return timely was the result"neither of carelessness, reckless indifference, nor intentional failure." Id. at 246 n. 4.

The Treasury Regulations provide an explanation of the other required element, "reasonable cause":

> If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship (as described in S 1.6161–1(b) of this chapter) if he paid on the due date. In determining whether the taxpayer was unable to pay the tax in spite of the exercise of ordinary business care and prudence in providing for payment of his tax liability, consideration will be given to all the facts and circumstances of the taxpayer's financial situation, including the amount and nature of the taxpayer's expenditures in light of the income (or other amounts) he could, at the time of such expenditures, reasonably expect to receive prior to the date prescribed for the payment of the tax. Thus, for example, a taxpayer who incurs lavish or extravagant living expenses in an amount such that the remainder of his assets and anticipated income will be insufficient to pay his tax, has not exercised ordinary business care and prudence in providing for the payment of his tax liability. Further, a taxpayer who invests funds in speculative or illiquid assets has not exercised ordinary business care and prudence in providing for the payment of his tax liability unless, at the time of the investment, the remainder of the taxpayer's assets and estimated income will be sufficient to pay his tax or it can be reasonably foreseen that the speculative or illiquid investment made by the taxpayer can be utilized (by sale or as security for a loan) to realize sufficient funds

to satisfy the tax liability. A taxpayer will be considered to have exercised ordinary business care and prudence if he made reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due.

Treas. Reg. S 301.6651-1(c)(1) (emphasis added). The term "undue hardship," for purposes of determining whether "reasonable cause" has been established, has been defined as follows:

The term "undue hardship" means more than an inconvenience to the taxpayer. It must appear that substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer for making payment on the due date of the amount with respect to which the extension is desired. If a market exists, the sale of property at the current market price is not ordinarily considered as resulting in an undue hardship.

Treas. Reg. S 1.6161-1(b).

Moreover, in determining whether a taxpayer has exercised "ordinary business care and prudence" in providing for the payment of its tax liability, courts must consider the nature of the delinquent tax. The regulations specifically provide that:

In determining if the taxpayer exercised ordinary business care and prudence in providing for the payment of his tax liability, consideration will be given to the nature of the tax which the taxpayer has failed to pay. Thus, for example, facts and circumstances which, because of the taxpayer's efforts to conserve assets in marketable form, may constitute reasonable cause for nonpayment of income taxes may not constitute reasonable cause for failure to pay over taxes described in section 7501 that are collected or withheld from any other person.

Treas. Reg. S 301.6651-1(c)(2).

The taxes that the Taxpayers failed to pay to the IRS timely were section 7501 taxes. Under IRC S 7501,

11

employers are required to collect or withhold the employee's portion of employment taxes as salaries are disbursed. These taxes are commonly referred to as "trust fund taxes" because the amounts withheld from employees' wages or salaries for employment taxes are to be held in a special fund in trust for the United States.

The parties disagree as to the appropriate legal standard to be applied to determine reasonable cause, as well as to the application of that standard to the facts and circumstances here. The Taxpayers maintain that their failure to pay taxes and make deposits on time was due to the fraudulent criminal activities of top officials at the Defense Agencies which so permeated the DLA that despite their ordinary business care and prudence, they were disabled and could not pay the payroll taxes when due without suffering undue hardship. The Taxpayers challenge the District Court's refusal to consider any financial difficulties in determining whether reasonable cause had been established. In support of their argument, the Taxpayers rely primarily on Fran Corp. v. United States, 164 F.3d 814 (2d Cir. 1999), as well as a number of district court and bankruptcy court decisions.[6]

On the other hand, the Government contends that the Taxpayers' failure to pay their employment taxes timely was due to willful neglect because they chose to pay other creditors and employees instead of the IRS. The Government further argues that the Taxpayers failed to establish reasonable cause. Relying on the Sixth Circuit's decision in Brewery, Inc. v. United States, 33 F.3d 589 (6th Cir. 1994), the Government takes the position thatfinancial distress alone does not establish reasonable cause. Relying on the language in the Treas. Reg. S 301.6651-1(c)(2), the Government maintains that when trust fund taxes are at issue, a more stringent standard is applied. The Government contends that the need for operating capital

_____

6. See Glenwal-Schmidt v. United States, 78-2 U.S.T.C. P 9610 (D. D.C. 1978); In re Arthurs Industrial Maintenance, Inc., 92-1 U.S.T.C. P 50242 (Bankr. W.D. Va. 1992), aff'd, 93-1 U.S.T.C. P 50092 (1993); In re Pool and Varga, Inc., 60 B.R. 722 (Bankr. E.D. Mich. 1986); and In re Slater, 190 B.R. 695 (Bankr. S.D. Fla. 1995).

necessary to prevent insolvency is not reasonable cause for failing to pay over the trust fund taxes at issue. The Government submits that because financial distress was the only fact and circumstance supporting the Taxpayers' failure to pay trust fund taxes timely, Brewery is dispositive. Thus, the Government concludes that the Taxpayers have failed to establish reasonable cause under the test set forth in Brewery.[7]

The District Court applied the bright line test set forth in Brewery, which provided that "financial difficulties can never constitute reasonable cause to excuse the penalties for nonpayment of withholding taxes by an employer." 33 F.3d at 592. Our sister court of appeals in Brewery based its adoption of the bright line standard upon both the trust language of section 7501 and Treas. Reg. S 301.6651–1(c)(2), which provides that circumstances which, because of the taxpayer's efforts to conserve marketable assets, may constitute reasonable cause for failure to pay income taxes, may not constitute reasonable cause for failure to pay trust fund taxes. The Brewery court, agreeing with the District Court there, held that since the trust fund taxes were for the government's exclusive use, the taxpayer's use of the trust funds for the payment of other creditors could not, as a matter of law, constitute reasonable cause for abating the penalties assessed under sections 6651 and 6656. Id. In so holding, the Brewery court found persuasive the reasoning of its court in an earlier decision, Collins v. United States, in which it opined that:

> It is no excuse that, as a matter of sound business judgment, the money was paid to suppliers and for wages in order to keep the corporation operating as a

_____

7. The Government further maintains that even if the District Court had followed the test applied in Fran Corp. v. United States, supra, the result
would have been the same. In support of its position, the Government proffers the Taxpayers' six year history with the corrupt government officials, that the Defense Agencies would refuse to pay on the contracts and unjustifiably reject the goods was foreseeable, and the Taxpayers were not without fault. Thus, the Government alleges that the Taxpayers' course of conduct did not constitute ordinary business care and prudence.

13

going concern -- the government cannot be made an unwilling partner in a floundering business.

Brewery, 33 F.3d at 593 (quoting Collins v. United States, 848 F.2d 740, 741-42 (6th Cir. 1988)) (internal citation omitted).

In the case before us, the District Court also found this reasoning persuasive in imposing a more stringent standard for abating penalties assessed for non-payment of trust fund taxes. What the District Court failed to consider, however, is that here the Government was not an unwilling partner in a floundering business but, indeed, an active participant.

The Brewery court's decision is troubling on a number of grounds. First, the application of such a bright line rule when a tax payment is delayed due to financial difficulties is inconsistent with Congress' creation of a "reasonable cause" exception, as well as the Treasury Regulations which set forth the factual circumstances that must be alleged to establish reasonable cause. Fran Corp., 164 F.3d at 818. Neither the penalty provisions of the Code nor the Treasury Regulations supports the bright line rule.

The Code does not bar consideration of financial difficulties in determining whether reasonable cause has been established, and it does not differentiate between trust fund taxes and nontrust fund taxes. Id. In this regard, the Second Circuit noted in Fran:

> This is particularly significant with respect to Section 6656, which specifically addresses the failure to deposit employment taxes yet requires neither a higher standard in such cases nor that courts turn a blind eye to a taxpayer's financial circumstances. The "reasonable cause"/"wilful neglect" standard has been part of the penalty provisions of the tax statutes since 1916, and Congress has not amended these provisions to create a different standard for the failure to pay trust fund taxes.

Id. (citing Boyle, 469 U.S. at 245 n.3).

Moreover, Treas. Reg. S 301.6651-1(c)(1) specifically directs courts to examine "all the facts and circumstances

14

of the taxpayer's financial situation." Similarly, under Treas. Reg. S 1.6161-1(b), we are required to determine whether the taxpayer would have suffered "undue hardship," i.e., "substantial financial loss," from the payment of taxes. As noted by the court in Fran, neither of these portions of the Treasury Regulations has changed since at least 1973, and with regard to Treas. Reg. S 1.6161-1, since 1960. 164 F.3d at 818. Where regulations have continued over a long period of time without substantial change and have applied to unamended or substantially reenacted statutes, they are deemed to have received the approval of Congress and thus have the effect of law. Id. (citation omitted). Thus, the court of appeals in Fran concluded that "[t]hese regulations clearly require a factual assessment of the taxpayer's financial situation to determine whether it has exercised ordinary business care and prudence in responding to competing financial obligations." Id. at 819.

The Fran court also found fault with the Brewery court's reliance on Treas. Reg. S 301.6651-1(c)(2) for support of a bright line rule. The Fran court found that the regulation simply provides that the court:

> consider, among other factors in [its] analysis of the taxpayer's care and prudence, "the nature of the tax which the taxpayer has failed to pay," and provides an illustrative example to suggest that "facts and circumstances which . . . may constitute reasonable cause for nonpayment of income taxes may not constitute reasonable cause for failure to pay over taxes described in section 7501 that are collected or withheld from any other person."

Id. (quoting Treas. Reg. S 301.6651-1(c)(2)). Thus, the Fran court concluded that although courts must take into account the obligations to pay section 7501 trust fund taxes in their determination of reasonable cause, their analysis must not stop there. Id. Accordingly, the court held:

> We recognize that it will be the rare case where the government is made the "unwilling partner in a floundering business" . . . without the employer

15

> incurring the duty to pay a penalty for having made
> such a choice, but it nonetheless remains for the court
> in each case to weigh all of the factors identified in the
> Regulations. To hold otherwise would effectively read
> out of the statute the "reasonable cause" exception to
> mandatory penalties in many employment tax cases.

Id.

We believe that the decision of the court of appeals in Fran is the better reasoned approach since it gives meaning to sections 6651 and 6656 of the Code and the regulations interpreting them. Brewery forecloses consideration of the facts and circumstances of the taxpayers' financial situation in contravention of the clear language of Treas. Reg. S 301.6651-1(c)(1). Thus, we conclude that the District Court erred as a matter of law in applying the bright line rule in Brewery.

B.

Having concluded that the test applied by the Second Circuit in Fran is the proper standard for evaluating reasonable cause, we now turn to the second issue presented -- whether, under the facts and circumstances here, the Taxpayers' failure to pay and deposit their employment taxes timely was due to reasonable cause and not willful neglect. If the evidence establishes that the Taxpayers exercised ordinary business care and prudence and that they would have suffered undue hardship if they would have paid the taxes when due, then reasonable cause will exist for the Taxpayers' failure to pay the tax timely. The Taxpayers will not be entitled to abatement of the penalties, however, if the delinquent payment was due to willful neglect. As a preliminary matter, therefore, we will address whether the Taxpayers' failure to pay the employment taxes timely was due to willful neglect.

The Government urges us to rule that any taxpayer who consciously chooses to pay other creditors over the IRS will have intentionally and willfully neglected to pay its employment taxes. At oral argument, the Government conceded that the only instance where nonpayment of trust fund taxes would not constitute willful neglect would be

16

where the nonpayment results through no fault of the taxpayer, or, in other words, is caused by some act of nature or other act beyond the taxpayer's control. Here, the Government contends, the Taxpayers created their financial predicament by participating in the bribery scheme. Because such activity is not devoid of fault, the Government argues, the nonpayment of taxes constitutes willful neglect. In support of its position, the Government relies on Boyle, which equated willful neglect with an absence of fault. 469 U.S. at 246 n. 4.8

If we were to endorse the Government's position, however, we would have to ignore the plain language of 6651 and 6656, as well as the interpreting regulations. The regulations clearly anticipate that a taxpayer will be forced to decide during times of financial distress how to distribute any available cash. Indeed, the regulations direct the courts to inquire as to the amount and nature of the taxpayer's expenditures in light of the income (or other amounts) it could reasonably expect to receive prior to the tax payment due date. Treas. Reg. S 301.6651-1(c)(1).

We are not convinced the Taxpayers' failure to pay trust fund taxes under the circumstances here amounted to willful neglect. Although the Taxpayers are not entirely innocent, their financial viability and cash flow was entirely dependent on the government contracts and the corrupt employees of the Defense Agencies. Thus, the Taxpayers' ability to pay its debts, including trust fund taxes, was controlled by the Defense Agencies. Indeed, the circumstances suggest that the Government was not an unwilling partner in a floundering business, but an active participant. Moreover, the deposition testimonies of Roger Mooney and D'Antonio indicated that the Taxpayers chose to pay only those creditors whose services were essential to maintaining and reworking the inventory. Both testified that maintaining minimal business operations was required to institute adversary proceedings against the Defense Agencies and collect the $2.1 million settlement. Without

_____

8. The question to be resolved in Boyle was whether under section 6651(a)(1) the taxpayer's reliance on an attorney to file an estate tax return timely was reasonable cause for the failure to meet the deadline.

17

the settlement, sufficient funds would not have existed to pay the delinquent trust fund taxes. D'Antonio further testified that he felt he had no choice but to pay employees from the funds received under government contracts because Delaware law makes it a criminal violation not to pay employees for time worked.

Although we recognize the need for stringent standards where trust fund taxes are involved, we cannot ignore the negative impact the Government's position has on public policy. The IRS has consistently taken the position that if a taxpayer cannot afford to pay trust fund taxes, no matter what the cause, it should close up shop. Both the economy and the federal fisc are negatively impacted by such an approach -- the amount of money flowing into the economy and the fisc is reduced as a result of increased unemployment, idle buildings and plants, and decreased sales of goods and services. Under this approach, no one benefits. Where, however, a taxpayer keeps its business operating at a minimal level in order to collect monies contractually due so that it can pay trust fund taxes and other debts, and does in fact collect the funds owed and pays its back taxes and other debts, the economy and federal fisc, including the IRS, benefit.

We cannot say, therefore, that under these circumstances choosing to pay those creditors, whose services were essential to maintaining and reworking the inventory, over the trust fund taxes constituted a conscious, intentional failure or reckless indifference. For this reason, we find that the Taxpayers' failure to pay trust fund taxes timely did not amount to willful neglect.

Having found that the Taxpayers' delinquency was not due to willful neglect, we must now determine whether reasonable cause existed for the untimely payment and deposit of employment taxes. Reasonable cause will exist if the taxpayer establishes that (1) it exercised ordinary business care and prudence, and (2) that undue hardship would have resulted if it paid the tax liability when it became due. Because our discussion of the undue hardship requirement will not detain us long, we will turn to that element first.

18

The Taxpayers make a persuasive argument in support of their position that they have established that payment of the taxes when due would have resulted in undue hardship. This position is supported by the following facts: (1) Mr. and Mrs. D'Antonio incurred substantial personal debts by obtaining loans and a mortgage on their residence in order to provide additional cash for the taxpayers to stay in business; (2) the personal funds were used to pay essential creditors and a small number of employees retained to re-work the inventory; (3) rent was not paid; (4) without the reduced staff, the Taxpayers would have to had shut down their operation; (5) the Taxpayers needed to stay in business so that they could collect on their claims against the government and obtain the funds needed to pay the IRS and other creditors. The evidence shows that if the Taxpayers had paid their employment taxes when due, they would have had insufficient funds to pay the reduced work force and essential creditors to enable them to remain a going concern. Moreover, the only markets for the $750,000 of inventory in the Taxpayer's warehouse were the Defense Agencies. The Taxpayers have clearly shown that they were at the mercy of the Defense Agencies as to whether they would have sufficient cash flow to operate the business. Under these facts and circumstances, we find that the Taxpayers have established that undue hardship would have resulted if they had paid their employment taxes on time.

Having concluded that the Taxpayers have satisfied the undue hardship requirement, we now turn to a consideration of whether the Taxpayers exercised ordinary business care and prudence under the facts and circumstances here. The District Court focused almost exclusively on the undue hardship requirement of reasonable cause and, having found that financial difficulties alone can never constitute reasonable cause, determined that there was no reason for it to consider whether the Taxpayers had met the other requirement of establishing reasonable cause -- ordinary business care and prudence.9

_____

9. The District Court commented in a footnote, however, that had it considered all the facts and circumstances surrounding the non-

19

In determining whether the Taxpayers exercised ordinary business care and prudence, we must consider all the facts and circumstances bearing on its financial situation.10 The record before the District Court contains substantial evidence that the Taxpayers exercised ordinary business care and prudence. In particular, the evidence shows that the Taxpayers did not incur any lavish or extravagant living expenses which caused the remainder of its assets and income to be insufficient to pay taxes. This conclusion is supported by the following evidence:

>    1. Any income received by Taxpayers on government contracts was used to pay either taxes owed to the IRS or employees' wages.
>
>    2. Consequently, the Taxpayers did not pay suppliers, rent, health and welfare premiums, employees' union dues, and workers' compensation insurance premiums.
>
>    3. Utility companies were only paid from D'Antonio's personal funds at the eleventh hour after the companies threatened to shut off service.
>
>    4. Suppliers were not paid any amounts owed from 1982–1986. Ultimately the Taxpayers owed approximately $7 million to their suppliers. D'Antonio had to personally guarantee payment to the suppliers so that they would continue providing suppliers without payments. As a result, D'Antonio was sued and several liens were placed against his personal assets.

_____

payment of the employment taxes, it would have reached the same conclusion. East Wind Industries, 33 F.Supp.2d at 346 n.6. The only factor that the District Court appears to have considered, however, is the Taxpayers' participation in the bribery scheme.

10. The dissent implies that we have construed Treas. Reg. S 301.6651–1(c)(1) to create a general "ordinary business care and prudence" standard for judging how a taxpayer has conducted its business. We do not intend to create such a general standard in applying the regulation to the Taxpayers' case. Rather, we have evaluated whether the Taxpayers exercised ordinary business care and prudence in providing for payment of the trust fund taxes in light of all the facts and circumstances bearing on their financial situation.

5. D'Antonio secured a mortgage on his personal residence and sold several personal assets to obtain cash to pay creditors. In return, D'Antonio accepted several notes from the Taxpayers which became worthless.

6. The Taxpayers' bookkeeper lent $65,000 of her personal funds to Taxpayers to pay creditors after D'Antonio's personal funds were depleted.

None of these actions reveals any spendthrift tendencies on the part of the Taxpayers.

Moreover, D'Antonio sought the advice of professional consultants on financial and legal matters with regard to the bribery scheme and the cash flow problems. He also consulted with similarly situated manufacturers to learn how they dealt with the bribery demands of the Defense Agencies' employees.

D'Antonio testified that he was required to keep the plant operating so that the Defense Agencies would pay for the inventory. Inspectors from the Defense Agencies visited the plant frequently to make sure the work was being completed. Even when the Taxpayers were unable to procure new government contracts they were required to retain a reduced workforce to rework inventory that had been unjustifiably and wrongly rejected by the Defense Agencies. At the time the Taxpayers filed for bankruptcy, inventory worth $750,000 was sitting in the Taxpayers' plant.

Finally, the evidence shows, by virtue of the testimonies of both D'Antonio and Mooney, that if the Defense Agencies had paid the Taxpayers what was owed under the contracts, the Taxpayers would have had sufficient funds to pay their employment taxes and other debts when due. Thus, it appears that the Taxpayers made reasonable efforts to conserve sufficient assets in marketable form, by maintaining $750,000 of inventory for the Defense Agencies, to satisfy their tax liability and, despite such efforts, were unable to pay their employment taxes when they became due.

Although all of these factors support a finding that the Taxpayers exercised ordinary business care and prudence,

the Taxpayers' participation in the bribery scheme raises some concern. The District Court concluded, as a matter of law, that the Taxpayers' course of conduct in initially acceding to the demands of the corrupt officials, and later refusing to pay when the demands became unrealistic, established that the Taxpayers failed to exercise ordinary business care and prudence during the periods in question. 33 F. Supp.2d at 346 n.6. In reaching this conclusion, the District Court was influenced by the fact that the Taxpayers had a long history of problems with the corrupt employees of the Defense Agencies and, therefore, the District Court opined that the employees' actions in rejecting goods and holding back payments should have been foreseen by the Taxpayers (as distinguished from the Navy's refusal to comply with the requirements of the Disputes Clause and of the Armed Services Procurement Regulations in Glenwal–Schmidt, 78–2 U.S.T.C. P 9610, which was not foreseeable). East Wind Industries, 33 F. Supp.2d at 346 n.6. The District Court also found significant the fact that the Taxpayers' delinquencies spanned a period of six years. Id. In this appeal, the Government raises the same bases as the District Court in support of its argument that the Taxpayers failed to exercise ordinary business care and prudence.

The Taxpayers counter that the payment of bribes by companies doing business with the Defense Agencies was considered the ordinary business practice in the industry. D'Antonio testified in his deposition that the bribery scheme was widespread and the only way to obtain government contracts with the Defense Agencies was to participate in the bribery scheme. His testimony is borne out by the sworn statement of Special Agent Ford of the FBI, in which Agent Ford indicated that D'Antonio, in an undercover capacity:

> recorded conversations with DPSC contractors who freely admitted to the payments of bribes and illegal gratuities to DPSC and DCAS employees. In most cases, D'ANTONIO travelled outside the Philadelphia metropolitan area to meet with the government contractors. The contractors' admissions widened the investigation and initiated new investigation [sic] of

22

> DPSC contractors and DCAS employees in other FBI
> Field Offices, DCIS Field Offices and U.S. Attorneys'
> Offices.

Affidavit of Joseph L. Ford, dated May 13, 1987, at p. 4.

While not directly on point, we held in In re American Biomaterials Corp. 954 F.2d 919, 927 (3d Cir. 1992), that where the failure to file timely returns, make deposits and pay taxes was the result of embezzlement by the company's officers, the failure was due to reasonable cause since their criminal actions prevented the corporation from fulfilling its duties under the Code. Our decision was predicated upon our conclusion that the officers acted without apparent authority when they committed the embezzlement and the corporation could not be vicariously responsible for the penalties resulting from the failure to file returns, make deposits and pay taxes. Id. At the very least, American Biomaterials held that criminal conduct does not automatically foreclose a finding of reasonable cause. Thus, based on our holding in American Biomaterials, we cannot automatically conclude that the Taxpayers' participation in the illegal procurement scheme warrants a finding that they failed to exercise ordinary business care and prudence.

Moreover, we are not persuaded by the Government's arguments that the facts established that the Taxpayers did not exercise ordinary business care and prudence. With regard to the Taxpayers' six-year history with corrupt officials, we must consider this period in the proper context. The delinquency began in 1982, sometime after the Taxpayers refused to pay the bribes. The Taxpayers attempted to put a stop to the bribery scheme beginning in 1983 when they contacted the legal staff at the Defense Department, and again in 1984, when they contacted other authorities. The Taxpayers filed a bankruptcy petition in 1984, and the FBI began its investigation later that same year. The Taxpayers eventually paid off their delinquent employment taxes, plus penalties and interest after the Bankruptcy Court enforced the Taxpayers' claims against the Defense Agencies, resulting in the $2.1 million settlement in 1991.

The Government also contends the Defense Agencies'

23

refusal to pay on the contracts and unjustified rejection of goods was foreseeable to the Taxpayers. Essentially, the Government contends that because the Taxpayers participated in the bribery scheme, they should have foreseen the consequences. We disagree that these actions were necessarily foreseeable. The bribery scheme started in 1976 and consisted of requests for minor favors and gratuities, which the Taxpayers apparently provided. The Taxpayers did not start to experience financial difficulties, however, until 1982.11 In light of these facts, we do not believe the Taxpayers could have anticipated that providing minor favors and gratuities to the corrupt employees would eventually result in the financial ruin of their business.

Although the Taxpayers' participation in the bribery scheme presents a close question, we nonetheless conclude that in light of all the facts and circumstances, the Taxpayers exercised ordinary business care and prudence. The parties should not read our decision as condoning the Taxpayers' conduct. We do not. We believe, however, that the Taxpayers have made a substantial attempt at righting their wrongdoing -- D'Antonio entered guilty pleas to two counts of violating 18 U.S.C. S 287, the False Claims statute, and he assisted the FBI in obtaining sufficient evidence of criminal activity to indict the corrupt officials and in bringing a stop to the bribery scheme. Moreover, the Taxpayers paid the ultimate price -- financial ruin of their business.

In reality, the illegal conduct of the corrupt employees of the Defense Agencies, after the Taxpayers refused to accede to the bribery demands, caused the financial distress which resulted in the Taxpayers' inability to pay its employment taxes timely. By its actions, the Government, through the Defense Agencies, became a willing partner in afloundering

_____

11. It appears that the Taxpayers' cash flow problems began after the bribery demands took on a new dimension -- demands for cash payments approximating 50 percent of the profits from the Taxpayers' business. When the Taxpayers refused to pay the demands for cash payments, the corrupt employees of the Defense Agencies refused to pay on the government procurement contracts and unjustifiably rejected the Taxpayers' goods. Consequently, inventory began to accumulate, cash flow was severely reduced, and new contracts were not forthcoming.

business. Therefore, this case presents that rare situation described in Fran, supra, where the Taxpayers should be relieved of the penalty for failing to pay and deposit their employment taxes when due. 164 F.3d at 819.

We therefore hold that because the Taxpayers exercised ordinary business care and prudence and would have suffered undue financial hardship if they would have paid their taxes when due, the nonpayment of trust fund taxes was due to reasonable cause and not willful neglect. Accordingly, the Taxpayers are entitled to an abatement of the penalties.

III.

For the reasons set forth above, we will reverse the judgment of the District Court and enter judgment for the Taxpayers.

STAPLETON, Circuit Judge, Dissenting:

This is one of those proverbial "hard" cases that makes "bad" law. The Taxpayers have apparently been grievously wronged by corrupt government officials. If that be the case, the Taxpayers should be entitled to recover compensation from the wrongdoers for all the losses that they have suffered, including, perhaps, tax penalties that would not have been incurred but for the wrongdoers' actions. But the Taxpayers' entitlement to compensation is not the issue before us. Rather, we must decide whether the Taxpayers' failure to pay trust fund taxes from 1982 through 1988 was due to "reasonable cause" and not to "willful neglect" within the meaning of IRCSS 6651 and 6656.

I agree with the Court that financial difficulties can and must be considered in determining whether a taxpayer is entitled to a refund of penalties under IRC #8E8E # 6651 and 6656. I do not agree, however, that consideration of the financial difficulties experienced by the Taxpayers in this case demonstrates that they are entitled under Treasury Regulation S 301.6651-1(c)(1) to the relief that they seek.

Section 301.6651-1(c)(1) of the Regulations provides examples of situations in which "reasonable cause" for non-payment exists and situations in which it does not exist. As the Court notes, the regulation provides, in part, that "a failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if he paid on the date due." Treas. Reg. S 301.6651-1(c)(1). This provision and the remainder of the section make it clear that: (1) "reasonable cause" will exist where the taxpayer has made a good faith effort to set aside the resources necessary for the satisfaction of its tax liability but cannot pay when the due date arrives because of unanticipated events beyond its control; and (2) "reasonable cause" will not exist where a taxpayer fails to husband its resources so that the requisite funds will be available for payment when the tax is due, e.g., when "a taxpayer . . . incurs lavish or extravagant

26

living expenses in an amount such that the remainder of his assets and anticipated income will be insufficient to pay his tax." Id.

Contrary to the Court's suggestion, S 301.6651-1(c)(1) does not create a general "ordinary business care and prudence" standard for judging how a taxpayer has conducted its business. It speaks solely to situations in which the taxpayer has (or has not) "exercised ordinary business care and prudence in providing for payment of his tax liability," only to have his efforts thereafter frustrated by unanticipated events beyond his control. Id. (emphasis added). Accordingly, S 301.6651-1(c)(1) provides no relief for a taxpayer who makes a deliberate decision to continue in business with no reasonable expectation that it will have the resources to satisfy its tax liability when due.

The record in this case strongly suggests that the Taxpayers made a deliberate decision (or series of deliberate decisions) to continue in business for most, if not all, of the period from 1982 to 1988 without making any provision for the payment of trust fund taxes and without any reasonable expectation that funds would be available to pay them when they were due. I would remand this case to the District Court for further proceedings and factfinding. While I think it unlikely that the Taxpayers will be able to establish that their failures to pay were due to"reasonable cause" and not "willful neglect," it is not inconceivable to me that they will be able to make such a showing for at least some portion of the period in question.1

_____

1. The most likely candidate would seem to me to be the period from early 1985 through a portion of 1986 during which the FBI was directing Mr. D'Antonio's undercover activities. Since continuing in business would appear to be a necessary predicate for such activities, it may be that there was "reasonable cause" for the failure to pay and no "willful neglect" during this period. In this regard, I note that S 301.6651 of the Regulations does not purport to be an exclusive list of situations in which a failure to pay is due to "reasonable cause" and not "willful neglect" under IRC SS 6651 and 6656.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit