# United States Tax Court

T.C. Memo. 2023-144

MICHAEL B. SHAPIRO,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

—————

Docket No. 26538-21L.                    Filed November 30, 2023.

—————

*Richard Stephen Kestenbaum* and *Scott L. Kestenbaum*, for petitioner.

*Frederick C. Mutter* and *Mimi M. Wong*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, *Judge*:  Petitioner, Michael B. Shapiro (Dr. Shapiro), contests his underlying liability for additions to tax under sections 6651(a)(2) and 6654 for his 2012–15 taxable years (years at issue) in this section 6330 proceeding.[1]  Dr. Shapiro argues that, because of a divorce and declining distributions from his medical practice during the years at issue, as well as a disabling condition he developed in 2015, he had reasonable cause for his failure to timely pay his income tax and to make required estimated tax payments during the years at issue.  While we do not doubt that Dr. Shapiro had personal, professional, and financial challenges during the years at issue, we nonetheless conclude that Dr. Shapiro has not shown that his failure to timely pay his income tax was due to reasonable cause in the light of all of the facts and circumstances.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  Some monetary amounts have been rounded to the nearest dollar.

**[\*2]** We therefore hold that section 6651(a)(2) additions to tax apply for the years at issue. In addition, we hold that Dr. Shapiro is liable for additions to tax under section 6654 for failing to make required estimated tax payments during the years at issue. Finding no abuse of discretion either, we sustain respondent's determination to collect unpaid amounts for the years at issue by levy.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The First and Second Stipulations of Facts and the attached Exhibits are incorporated herein by this reference. Dr. Shapiro resided in Florida when he timely filed his Petition.[2]

I. *Dr. Shapiro's Medical Career*

Dr. Shapiro earned a medical degree from New York Medical College in 1995. During the years at issue he was a partner at Orlin & Cohen Orthopedic Associates, LLP (OCOA), in New York. He worked as an orthopedic surgeon specializing in the performance of spinal surgeries for nearly the entirety of the years at issue, as explained below.

OCOA reported ordinary business income[3] and made the following distributions to Dr. Shapiro in 2011 and during the years at issue:

| Year | Ordinary Business Income | Distributions |
|------|--------------------------|---------------|
| 2011 | Unknown[4] | $1,526,811 |

---

[2] Unless otherwise agreed by the parties in writing, venue for an appeal is the U.S. Court of Appeals for the Eleventh Circuit. *See* § 7482(b)(1)(G)(i).

[3] We summarize only the items of "Ordinary business income (loss)" reported on each Form 1065, U.S. Return of Partnership Income, Schedule K–1, Partner's Share of Income, Deductions, Credits, etc., that OCOA issued to Dr. Shapiro and that is in the record. Neither party has requested that we make any findings about the amounts of other items reported on each Schedule K–1, such as the comparatively small amounts of interest income that OCOA reported to Dr. Shapiro.

[4] Dr. Shapiro reported income from "rental real estate, royalties, partnerships, S corporations, trusts, etc." of $1,937,633 for 2011, but his 2011 Schedule E, Supplemental Income and Loss, is not in the record and the record is unclear as to whether the entirety of this amount came from OCOA.

[*3]

| Year | Ordinary Business Income | Distributions |
|------|--------------------------|---------------|
| 2012 | Unknown | 1,190,000 |
| 2013 | $1,211,110 | 749,659 |
| 2014 | 1,243,042 | 974,507[5] |
| 2015 | 940,724 | 878,000[6] |

Dr. Shapiro's distributions from OCOA declined after 2011 in large part because he was "an out-of-network surgeon" who "didn't participate in the [health insurance] plans" until 2011, but OCOA required "the spine surgeons . . . to go in network" after that point.[7] He did not personally make this decision, and he protested it to no avail.

On August 18, 2015, Dr. Shapiro developed a disabling condition preventing him from working as an orthopedic surgeon for the rest of

---

[5] The parties erroneously stipulated that the 2014 distributions from OCOA totaled $974,607. The record is otherwise clear that the correct distribution amount is $974,507, and we so find. *See Cal-Maine Foods, Inc. v. Commissioner*, 93 T.C. 181, 195 (1989) (holding that we are not obliged to accept a stipulation between the parties when it is clearly contrary to facts disclosed by the record).

[6] Dr. Shapiro argues that he received distributions of only $620,000 for 2015. He bases this claim on a letter dated February 18, 2016, from Michael Passet, chief executive officer of OCOA, which states that Dr. Shapiro received "total compensation from the practice" of $620,000 for 2015. The parties have stipulated that the $620,000 amount "is inconsistent with both the ordinary business income and distributions reported . . . on the Schedule K–1."

Michael Passet did not testify at trial, and the letter itself gives no indication of the purpose for which it was used, the circumstances surrounding its creation, the records on which it was based, or what "total compensation from the practice" means. While Dr. Shapiro testified that the letter "was for insurance company stuff that I was dealing with at that time" and that "[w]e get less money because as partners we pay for other expenses of the practice, whether it's rent or maintenance or unforeseen things that may happen[,]" these explanations are insufficiently detailed to explain the six-figure discrepancy between the 2015 Schedule K–1 and the letter without further corroborating evidence. We accordingly give the February 18, 2016, letter no weight.

[7] Another contributing factor was OCOA's increased debt service expenses and capital expenditures during the years at issue.

[*4] his life. At some point after December 31, 2015, Dr. Shapiro redeemed his interest in OCOA.[8]

On April 18, 2017, in the U.S. District Court for the Southern District of New York, Dr. Shapiro sued certain underwriters at Lloyd's of London for breach of contract in relation to disability insurance coverage. On September 15, 2017, again in the U.S. District Court for the Southern District of New York, Dr. Shapiro filed a separate action against certain underwriters at Lloyd's of London for breach of contract and declaratory judgment in relation to disability insurance coverage. Dr. Shapiro and the defendants settled both lawsuits and filed a stipulation of voluntary dismissal with prejudice on September 16, 2019. Dr. Shapiro received a lump-sum payment in connection with the settlement in September or October 2019. The only copy of the settlement agreement in evidence is fully redacted, and the record does not otherwise disclose the amount of the lump-sum payment.

II. *Dr. Shapiro's Family and Divorce*

Dr. Shapiro married Marna Shapiro (Mrs. Shapiro, and together with Dr. Shapiro, the Shapiros) on May 25, 1995. The Shapiros have two children from their marriage, a daughter born in 1999 and a son born in 2002. Mrs. Shapiro did not work outside the home while pregnant with her daughter or during the remainder of her marriage to Dr. Shapiro.

In 2004 the Shapiros purchased a home for $1.8 million. In connection with the home purchase, they obtained a bank loan for approximately $1.3 million. They also borrowed from June Shapiro,[9] who is Dr. Shapiro's mother, and from Mrs. Shapiro's father; funds from these sources totaled approximately $500,000. June Shapiro occasionally helped the Shapiros financially throughout their marriage.

On April 8, 2011, Dr. Shapiro initiated an action for divorce against Mrs. Shapiro in the Supreme Court of the State of New York, Nassau County (family court). Pursuant to New York law, a series of automatic orders became binding on the Shapiros upon the filing and service of the summons and complaint in the divorce action. The

---

[8] The record is unclear concerning whether a payment based on the value of his interest in OCOA and related entities that Dr. Shapiro made on or about October 21, 2016, in connection with the divorce action that we describe below occurred before or after his OCOA interest terminated. *See infra* note 13.

[9] June Shapiro did not testify at trial.

[*5] automatic orders remained in full force and effect during the pendency of the divorce action, which concluded on February 14, 2014.[10] Among the automatic orders was an order stating that from April 8, 2011, and continuing during the pendency of the divorce action, neither party could liquidate, sell, or transfer any assets (whether held individually or jointly), including retirement funds, without consent from the other party or further order of the family court. During the pendency of the divorce action, neither party granted consent to the other to liquidate or sell an asset. In addition, there is no indication that either party petitioned the family court to liquidate assets to pay delinquent tax liabilities.

On October 6, 2011, Dr. Shapiro reported to the family court that he had assets valued at $221,829, consisting of (1) $27,000 in a checking account, (2) $188,463 in an individual retirement account, and (3) $6,366 in a mortgage escrow account. He reported the value of his business and real estate interests as "subject to appraisal." He also reported that he had total liabilities of $2,368,537, including approximate federal and state income tax liabilities of $304,553, and that he was a defendant in three medical malpractice lawsuits and three general lawsuits.

In an interim order dated April 30, 2012, the family court ordered Dr. Shapiro to make various payments to Mrs. Shapiro. Specifically, the family court ordered Dr. Shapiro to pay:

- monthly carrying charges on the marital residence of $14,943 (commencing on May 1, 2012, but retroactive to November 22, 2011);

- monthly interim maintenance of $11,000 and monthly child support of $5,500 (each commencing on May 1, 2012, but retroactive to November 22, 2011);

- arrears of $2,000 per month in respect of the retroactive amounts owed until they were satisfied;

---

[10] In the First Stipulation of Facts, the parties referred to the divorce action as concluding on February 14, 2004, which is a typographical error. The record is otherwise clear that the divorce action concluded on February 14, 2014, the date that the family court issued its trial decision, and we so find. *See Cal-Maine Foods, Inc.*, 93 T.C. at 195.

[*6] • for his children's sports, dance, camp, and other extracurricular activities;

• for his wife's and children's existing medical insurance coverage;

• for his wife's and children's medical and pharmaceutical expenses, provided they used in-network providers and the expenses were unreimbursed, non-elective, and non-cosmetic;

• for any necessary dental, optical, psychiatric, or therapeutic expenses for his wife and children; and

• for an existing life insurance policy in a total benefit amount of $4 million.

In the interim order, the family court performed a "computation of the statute" to determine "a presumptively correct maintenance payment of $13,100.00 per month ($157,200.00 annually)." Ultimately, however, the family court ordered maintenance of only $11,000 per month because "[t]he presumptive statutory amount does not factor in [Dr. Shapiro's] substantial state and federal tax payment obligations, unreimbursed medical expenses for [Mrs. Shapiro] and the parties' two children, the carrying costs on the marital residence and other Court-ordered obligations."

On February 21, 2013, Dr. Shapiro executed an affidavit in connection with his divorce proceedings. He prepared the affidavit to support a request for a decrease of the amounts that he was required to pay pursuant to the interim order. He argued that he did not have sufficient income to pay the court-ordered amounts and his taxes. In the affidavit, he stated in part:

• he had monthly expenses of $58,634 and monthly income of $50,000;

• his 2012 income was lower than his 2011 income, upon which the award amounts in the April 30, 2012, interim order were based;

• the Shapiros never had any savings and lived above their means;

• the Shapiros lived paycheck to paycheck during their marriage;

• the Shapiros' only asset was their principal residence, which was heavily mortgaged; and

[*7] • during their marriage, the Shapiros were always in trouble with taxing authorities because they never saved enough money to account for their tax obligations.

The family court referred consideration of Dr. Shapiro's request for a decrease to trial for determination.

The family court held trial in the divorce action on various dates between June 19 and September 22, 2013. The family court issued its trial decision on February 14, 2014. In pertinent part, the family court:

• stated that, because of excessive spending during their marriage, the Shapiros did not timely pay their tax obligations and often had to borrow from June Shapiro to pay their taxes;

• determined that a decrease in its April 30, 2012, award to Mrs. Shapiro of interim maintenance was unwarranted;

• awarded Mrs. Shapiro 15% of Dr. Shapiro's interest in OCOA and two related entities, or $389,135;

• ordered the Shapiros to sell the marital residence on or before June 1, 2016, and to divide the net proceeds equally between themselves;

• ordered Mrs. Shapiro to pay all utilities and related carrying charges for the marital residence until it was sold on or before June 1, 2016;

• ordered Dr. Shapiro to pay Mrs. Shapiro $20,000 per month in maintenance from March 1, 2014, to March 1, 2019, reduced by payments that Dr. Shapiro made directly toward the mortgage, property taxes, and homeowners' insurance until the sale of the marital residence;

• ordered Dr. Shapiro to pay child support of $6,250 per month beginning on March 1, 2014;

• ordered Dr. Shapiro to pay Mrs. Shapiro 50% of the balance in a Citibank account as of the commencement of the divorce action, or $15,953;

[*8] • awarded Mrs. Shapiro 50% of the value of an individual retirement account as of the date of commencement of the divorce action;

• ordered Dr. Shapiro to maintain a $4 million life insurance policy until his younger child reached 21 years of age;

• ordered Dr. Shapiro to maintain health insurance for the benefit of his children and to pay their unreimbursed medical, dental, orthodontic, pharmaceutical, psychological, and therapeutic expenses;

• ordered the Shapiros each to pay their own vehicle expenses;

• ordered Dr. Shapiro to pay for all reasonable extracurricular expenses of his children, not to exceed $5,000 per year per child;

• ordered the Shapiros to share equally in the cost of reasonable summer camp expenses for their children; and

• ordered Dr. Shapiro to pay $150,000 of legal fees for Mrs. Shapiro and $15,000 of expert witness fees.

III.    *Payments Related to the Divorce*

On brief, respondent assumes that Dr. Shapiro actually paid the carrying charges on the marital residence, spousal maintenance, and child support in the amounts and at the times ordered by the family court in its April 30, 2012, interim order and in its February 14, 2014, trial decision. We deem this to be a concession by respondent that Dr. Shapiro made all of these payments in the amounts ordered through at least the end of the years at issue, and we so find. We are unable, however, to find that Dr. Shapiro made payments of court-ordered arrears because Dr. Shapiro has not substantiated whether or when those payments were made and respondent has not conceded that the arrears were paid.

**[\*9]** We specifically find that Dr. Shapiro made the following additional payments in connection with the divorce action:

| Date | Recipient | Amount |
|---|---|---|
| November 14, 2011 | Dr. Shapiro's divorce lawyers | $20,000 |
| June 10, 2012 | Brant Lake Camp (for child's enrollment in summer 2012) | 5,000 |
| July 11, 2012 | Dr. Shapiro's divorce lawyers | 22,313 |
| July 26, 2012 | Brant Lake Camp (for child's enrollment in summer 2012) | 5,730 |
| October 9, 2012 | Mrs. Shapiro's divorce lawyers (prepayment of legal fees to be awarded in the future) | 20,000 |
| October 26, 2012 | Dr. Shapiro's divorce lawyers | 11,272 |
| January 2, 2013 | Dr. Shapiro's divorce lawyers | 3,356 |
| January 4, 2013 | Dr. Shapiro's divorce lawyers | 17,000 |
| On or about February 18, 2013 | Mrs. Shapiro's divorce lawyers (pursuant to an interim counsel fee award by the family court) | 65,000 |
| April 8, 2013 | Dr. Shapiro's divorce lawyers | 20,000 |

[*10]

| Date | Recipient | Amount |
|---|---|---|
| June 28, 2013 | Dr. Shapiro's divorce lawyers | 25,000 |
| August 30, 2013 | Dr. Shapiro's divorce lawyers | 50,000 |
| November 5, 2013 | Dr. Shapiro's divorce lawyers | 10,000 |
| February 24, 2014 | Brant Lake Camp (for child's enrollment in summer 2013) | 6,925 |
| On or about March 27, 2014 | Cara Klein, Ph.D. | 2,850 |
| September 2, 2014 | Dr. Shapiro's divorce lawyers | 25,000 |
| On or about September 5, 2014 | Mrs. Shapiro's divorce lawyers | 150,000 |
| February 25, 2016 | The Law Office of Anthony A. Capetola[11] | 35,764[12] |
| February 28, 2016 | Dr. Shapiro's divorce lawyers | 11,794 |

[11] Dr. Shapiro credibly testified that Anthony A. Capetola was Mrs. Shapiro's "new counsel" in 2016, and we so find.

[12] On February 25, 2016, the Shapiros sold the marital residence. Dr. Shapiro did not actually receive any proceeds from this sale; instead, the buyers of the residence paid $35,764 at his direction and for his benefit as a distribution in escrow to The Law Office of Anthony A. Capetola.

**[*11]**

| Date | Recipient | Amount |
|---|---|---|
| On or about October 21, 2016 | Mrs. Shapiro (for the family court's award of 15% of Dr. Shapiro's interest in OCOA and two related entities) | 389,535[13] |

We further find that Dr. Shapiro paid health insurance expenses in 2011 and during the years at issue in the following amounts:

| Year | Amount |
|---|---|
| 2011 | $28,534 |
| 2012 | 28,534 (at a minimum)[14] |
| 2013 | 35,224 |
| 2014 | 38,068 |
| 2015 | 42,827 |

IV.    *Transfers to Dr. Shapiro*

June Shapiro transferred $30,000 to Dr. Shapiro on December 21, 2015.  She also transferred another $20,000 to Dr. Shapiro on October 4, 2016.

---

[13] The record is unclear concerning how Dr. Shapiro funded this amount and whether it was funded by Dr. Shapiro's redemption of his interest in OCOA that occurred on an unspecified date after December 31, 2015.  *See supra* note 8 and accompanying text.

[14] The record does not disclose Dr. Shapiro's actual health insurance expense in 2012, but respondent assumes on brief that the 2011 amount also represents Dr. Shapiro's 2012 health insurance expense.  We deem this to be a concession by respondent that Dr. Shapiro had a health insurance expense of at least $28,534 in 2012, and we so find.

[*12] V.    *Tax Reporting and Payments*

Dr. Shapiro timely filed his Form 1040, U.S. Individual Income Tax Return, with extension for each year at issue as follows:

| Taxable Year | Filing Date | Filing Status | Tax Reported as Due |
|---|---|---|---|
| 2012 | October 11, 2013 | Married filing separately | $332,170[15] |
| 2013 | October 14, 2014 | Married filing separately | 446,929 |
| 2014 | October 14, 2015 | Single | 436,531 |
| 2015 | On or before October 15, 2016 | Single | 215,387 |

Dr. Shapiro made the following income tax payments either during the pendency of the divorce action[16] or in respect of the years at issue:

| Taxable Year | Payment Date | Amount |
|---|---|---|
| 2010 | April 15, 2011 | $160,000 |
| 2011 | October 18, 2011 | 100,000 |
| 2011 | March 6, 2012 | 300,000 |
| 2011 | April 15, 2012 | 45,000 |

---

[15] In addition to the tax that Dr. Shapiro reported as due on his 2012 Form 1040, respondent later assessed a deficiency in tax for 2012. There is no indication that Dr. Shapiro is disputing the 2012 deficiency as part of his challenge to the underlying liabilities in this case, and we deem any such challenge to be conceded because he did not assign any error to it in his Petition. *See* Rule 331(b)(4).

[16] For the sake of completeness, we note that Dr. Shapiro made a $300,000 estimated tax declaration payment toward his 2010 tax liability on January 18, 2011, *before* the pendency of the divorce action, that is not listed in the table.

[*13]

| Taxable Year | Payment Date | Amount |
|---|---|---|
| 2011 | August 16, 2012 | 115,000 |
| 2011 | January 16, 2013 | 45,000 |
| 2012 | November 3, 2014 | 382,952 |
| 2013 | November 3, 2014 | 281,293 |
| 2013 | April 20, 2022 | 172,925 |
| 2014 | April 11, 2014 | 75,000 |
| 2014 | June 25, 2014 | 80,000 |
| 2014 | April 15, 2015 | 50,000 |
| 2014 | April 20, 2022 | 235,120 |
| 2015 | April 20, 2022 | 181,121 |

As shown above, Dr. Shapiro did not pay any of the tax that he reported as due for 2012, 2013, or 2015 on or before the payment due dates (or even the extended filing dates) for those years; for 2014, however, he made two estimated tax payments, along with another timely partial payment on April 15, 2015. Shortly after Dr. Shapiro filed his return for each year at issue, respondent assessed the tax that Dr. Shapiro reported, as well as (1) an addition to tax under section 6651(a)(2) for failure to timely pay tax, (2) an addition to tax under section 6654 for failure to make estimated tax payments, and (3) accrued interest. Respondent later made further assessments of section 6651(a)(2) additions to tax and accrued interest for each year at issue.

VI.   *Section 6330 Hearing*

On November 13, 2020, the Internal Revenue Service (IRS) sent Dr. Shapiro a Letter 1058, Final Notice of Intent to Levy and Notice of Your Rights to a Hearing (levy notice), with respect to the years at issue. On December 2, 2020, Dr. Shapiro timely submitted Form 12153, Request for a Collection Due Process or Equivalent Hearing (hearing request), in response to the levy notice. In the hearing request, Dr.

[*14] Shapiro requested that respondent determine that his income tax liabilities for the years at issue were not currently collectible because he was not earning any income. On December 8, 2020, respondent transferred consideration of the hearing request to the IRS Independent Office of Appeals (Appeals).[17] On or about January 5, 2021, Appeals assigned consideration of the hearing request to Appeals Officer Stephanie Armenia (AO Armenia). On January 22, 2021, Dr. Shapiro sent Revenue Officer Raul Candelario (RO Candelario) a Request for Abatement of Penalty (penalty abatement request) with respect to the additions to tax for failure to timely pay tax for the years at issue.

On February 1, 2021, AO Armenia scheduled the section 6330 hearing for February 26, 2021. AO Armenia also requested that Dr. Shapiro provide either confirmation that he had paid his income tax liabilities in full for the years at issue or, alternatively, certain financial information, including a Form 433–A, Collection Information Statement for Wage Earners and Self-Employed Individuals.

On February 22, 2021, RO Candelario denied the penalty abatement request. On February 23, 2021, Dr. Shapiro sent AO Armenia and RO Candelario a Protest of Abatement of Penalty (penalty protest) with respect to the additions to tax for failure to timely pay tax for the years at issue. In the penalty protest, Dr. Shapiro requested abatement of the additions to tax for failure to timely pay tax for the years at issue on the ground of reasonable cause. He contended that he exercised ordinary business care and prudence. He stated that three events prevented him from paying his income tax liabilities for the years at issue: (1) divorce proceedings with his wife; (2) a reduction in his income from OCOA; and (3) the permanent disability that he developed on August 18, 2015. He also incorrectly stated, however, that at the time he filed for divorce on April 8, 2011, he had been timely paying his federal income tax. In the Form 433–A attached to the penalty protest, Dr. Shapiro reported that he had liquid assets the value of which exceeded $8 million as of January 22, 2021, and that his only liability as of the same date related to his purchase or lease of a $200,000 Mercedes automobile. Although the 2019 settlement agreement that Dr. Shapiro reached with Lloyd's of London, which he also attached to the penalty protest, is now redacted, we infer that some portion of the

_____

[17] On July 1, 2019, the IRS Office of Appeals was renamed the IRS Independent Office of Appeals. *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983 (2019).

**[\*15]** $8 million in liquid assets that he reported was attributable to the settlement.

On February 26, 2021, AO Armenia and Dr. Shapiro's representative held the section 6330 hearing by telephone. AO Armenia informed Dr. Shapiro's representative that, after her review of the information that Dr. Shapiro provided, she concluded that he had sufficient assets from which to pay his income tax liabilities for the years at issue. AO Armenia also indicated that she would sustain the proposed levy action because Dr. Shapiro had not shown reasonable cause for penalty abatement.

On June 24, 2021, Appeals sent Dr. Shapiro a Notice of Determination Concerning Collection Action under IRC Sections 6320 or 6330 of the Internal Revenue Code (Notice of Determination) for the years at issue. AO Armenia sustained the proposed levy action to collect Dr. Shapiro's income tax liabilities for the years at issue.

AO Armenia determined that Dr. Shapiro's request for currently not collectible status was inappropriate. She found that Dr. Shapiro had sufficient means to pay his tax liabilities in full and that he failed to provide a viable collection alternative. AO Armenia also concluded that Dr. Shapiro had a poor compliance history.

AO Armenia denied Dr. Shapiro's penalty protest because she found that he "failed to show reasonable cause for paying late and not making timely estimated tax deposits." She determined that Dr. Shapiro failed to show ordinary business care and prudence with respect to payment of his income tax liabilities during the years at issue. She also found that Dr. Shapiro had sufficient available funds in investment accounts and disposable income during the years at issue to pay his income tax liabilities, even after consideration of his payments for alimony, child support, and marital expenses. She concluded that respondent properly assessed additions to tax for failure to timely pay and for failure to make estimated tax payments against Dr. Shapiro for the years at issue.

**[\*16]**                                    OPINION

I.    *Jurisdiction and Standard of Review*

We have jurisdiction to review the IRS's determination concerning a levy action when the taxpayer petitions for review.[18]  *See* § 6330(d)(1); *Atl. Pac. Mgmt. Grp., LLC v. Commissioner*, 152 T.C. 330, 333 (2019).  Dr. Shapiro has petitioned for review of the Notice of Determination, which concerns a proposed levy action.  We therefore hold that we have jurisdiction to review the Notice of Determination.

Where the validity of the taxpayer's underlying liability is properly at issue, *see* § 6330(c)(2)(B), we review the underlying liability de novo, *Sego v. Commissioner*, 114 T.C. 604, 609–10 (2000).  Underlying liability includes additions to tax.  *See Katz v. Commissioner*, 115 T.C. 329, 339 (2000).  We review the IRS's determinations respecting any nonliability issues for abuse of discretion.  *Goza v. Commissioner*, 114 T.C. 176, 182 (2000).

On brief, Dr. Shapiro challenges only his underlying liability for the section 6651(a)(2) and 6654 additions to tax.  He does not challenge respondent's determination that currently not collectible status is inappropriate, nor does he raise any other nonliability issue with respect to the proposed levy action.  We review Dr. Shapiro's challenge to his underlying liabilities de novo.

II.    *Underlying Liabilities*

A taxpayer may challenge the existence or amount of his underlying tax liability in a section 6330 hearing, and in a proceeding before this Court, only if he "did not receive any statutory notice of deficiency for such tax liability or did not otherwise have an opportunity to dispute" it.  § 6330(c)(2)(B).  The parties agree that Dr. Shapiro did not have a prior opportunity to dispute the section 6651(a)(2) and 6654 additions to tax for the years at issue.  The record is also clear that AO Armenia considered Dr. Shapiro's challenges to these additions to tax in the section 6330 hearing.  *Cf. Giamelli v. Commissioner*, 129 T.C. 107,

---

[18] While we historically have held that a taxpayer must timely file a petition in order to invoke our CDP jurisdiction, the Supreme Court of the United States has recently held to the contrary.  *See Boechler, P.C. v. Commissioner*, 142 S. Ct. 1493, 1501 (2022) ("Section 6330(d)(1)'s 30-day time limit to file a petition for review of a collection due process determination is an ordinary, nonjurisdictional deadline subject to equitable tolling."); *see also Mellon v. Commissioner*, T.C. Memo. 2023-108, at \*14.  In any case, Dr. Shapiro timely filed his Petition.

**[\*17]** 115 (2007) ("[W]e do not have authority to consider section 6330(c)(2) issues that were not raised before the Appeals Office."). We therefore proceed to consider Dr. Shapiro's underlying liability for the section 6651(a)(2) and 6654 additions to tax in turn.

A.    *Section 6651(a)(2)*

Section 6651(a)(2) imposes an addition to tax for failure to pay the amount of tax shown on a taxpayer's federal income tax return on or before the payment due date, unless such failure is due to reasonable cause and not due to willful neglect.[19]  *See El v. Commissioner*, 144 T.C. 140, 150 (2015).  The section 6651(a)(2) addition to tax applies only when an amount of tax is shown on a return filed by the taxpayer or a section 6020 substitute for return prepared by the Secretary.  *See* § 6651(a)(2), (g)(2); *Cabirac v. Commissioner*, 120 T.C. 163, 170 (2003), *aff'd per curiam*, No. 03-3157, 2004 WL 7318960 (3d Cir. Feb. 10, 2004); *see also El*, 144 T.C. at 150.

Section 7491(c) places the burden of production on the Secretary with respect to the liability of any individual for any penalty, addition to tax, or additional amount.  "The Commissioner's burden of production with respect to the section 6651(a)(2) addition to tax requires that the Commissioner introduce evidence that a return showing the taxpayer's tax liability was filed for the year in question."  *Wheeler v. Commissioner*, 127 T.C. 200, 210 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008).  The Commissioner must also introduce evidence that the taxpayer failed timely to pay the tax shown on the return.  *See Reynoso v. Commissioner*, T.C. Memo. 2013-25, at \*48–49.  Once the Commissioner meets his burden of production, the taxpayer has the burden of proof and must come forward with sufficient evidence to persuade us that the Commissioner's determination is incorrect.  *See Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001).  The Commissioner need not present evidence as to reasonable cause in order to meet his burden of production.  *See Charlotte's Office Boutique, Inc. v. Commissioner*, 121 T.C. 89, 110 (2003), *supplemented by* T.C. Memo. 2004-43, *aff'd*, 425 F.3d 1203 (9th Cir. 2005).

Respondent has met his burden of production.  The parties have stipulated the income tax returns that Dr. Shapiro filed for the years at issue and the amount of tax that each one showed.  Respondent has also

---

[19] The section 6651(a)(2) addition to tax is imposed only on the net amount of tax that remains unpaid after the payment due date.  *See* § 6651(b); Treas. Reg. § 301.6651-1(d)(1).

[*18] produced a Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, for each year at issue showing that Dr. Shapiro had paid none (or, for 2014, only $205,000 out of $436,531) of the tax due by the payment due date. Dr. Shapiro therefore has the burden of proving that respondent's decision to assert section 6651(a)(2) additions to tax for the years at issue was incorrect.

Dr. Shapiro argues that he has demonstrated reasonable cause for his failure to timely pay his tax for the years at issue. On brief, respondent has conceded the issue of willful neglect, so Dr. Shapiro's burden of proof extends only to whether reasonable cause existed for his failure to timely pay his tax.

Whether reasonable cause is present in any given situation is a question of fact. *See Commissioner v. Lane-Wells Co.*, 321 U.S. 219, 225 (1944); *Sami v. United States*, 277 F.2d 153, 154 (5th Cir. 1960); *Se. Fin. Co. v. Commissioner*, 153 F.2d 205, 205–06 (5th Cir. 1946), *aff'g* 4 T.C. 1069 (1945); *Crocker v. Commissioner*, 92 T.C. 899, 913 (1989). A failure to pay is considered due to reasonable cause if the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability but was either unable to pay the tax or would suffer undue hardship if he paid on the due date. *See* Treas. Reg. § 301.6651-1(c)(1); *see also Estate of Hartsell v. Commissioner*, T.C. Memo. 2004-211, slip op. at 7. The reasonable cause inquiry thus includes two questions: first, whether the taxpayer used ordinary business care and prudence, and second, whether he was nevertheless unable to pay the tax or would suffer undue hardship if he did. *See Lindsay v. United States*, 4 F.4th 292, 294 (5th Cir. 2021). "The term 'undue hardship' means more than an inconvenience to the taxpayer. It must appear that substantial financial loss . . . will result to the taxpayer for making payment on the due date . . . ." Treas. Reg. § 1.6161-1(b); *see* Treas. Reg. § 301.6651-1(c)(1) (clarifying that an "undue hardship" means an undue hardship "as described in § 1.6161-1(b) of this chapter").

In determining whether the taxpayer is unable to pay the tax or would suffer undue hardship in spite of the exercise of ordinary business care and prudence, consideration is given to all of the facts and circumstances of the taxpayer's financial situation. *See* Treas. Reg. § 301.6651-1(c)(1). This includes the amount and nature of the taxpayer's expenditures in the light of the income (or other amounts) he could, at the time of such expenditures, reasonably expect to receive before the date prescribed for the payment of the tax. *See id.* A taxpayer

**[\*19]** who incurs lavish or extravagant living expenses in such an amount that the remainder of his assets and anticipated income will be insufficient to pay his tax has not exercised ordinary business care and prudence in providing for the payment of his tax liability. *See id.* A taxpayer is considered to have exercised ordinary business care and prudence if he made reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due. *See id.*

"The reasonable cause standard is a one-time test to be passed or failed at the payment due date. . . . Events occurring after the due date are still relevant, however, to the reasonable cause determination." *Estate of Hartsell*, T.C. Memo. 2004-211, slip op. at 7; *see Estate of Sowell v. United States*, 198 F.3d 169, 172–73 (5th Cir. 1999) (considering a taxpayer's failure to attempt to obtain a loan for four years after the payment due date and its failure to appeal the IRS's denial of its request for a payment extension). Reasonable cause may not exist if the taxpayer does not comply within a reasonable period after the facts and circumstances explaining the taxpayer's noncompliant behavior cease to exist. *See Steven Bros. Found., Inc. v. Commissioner*, 39 T.C. 93, 130 (1962) ("[A]n acceptable reason for failure to file a return will excuse such failure only so long as the reason remains valid."), *aff'd in part, rev'd and remanded in part*, 324 F.2d 633 (8th Cir. 1963); *Estate of Maltaman v. Commissioner*, T.C. Memo. 1997-110, slip op. at 16 (holding that the taxpayer's reliance on a preparer's advice that a second return filing extension could be obtained became unreasonable during the four-month period after the taxpayer learned that the IRS denied the second extension request and the return was overdue); *cf. Russell v. Commissioner*, T.C. Memo. 2011-81, 2011 WL 1314673, at \*8 ("Courts considering the issue have held that the determination of 'reasonable cause' under section 6651(a)(2) should receive similar analysis to that under section 6651(a)(1).").

"Adverse economic conditions do not necessarily constitute reasonable cause" for nonpayment of federal income tax, *Estate of Hartsell*, T.C. Memo. 2004-211, slip op. at 12, at least absent "the serious effort required to pay . . . timely[,]" *id.*, slip op. at 15. A taxpayer "cannot rely on undue financial hardship alone to excuse his inability to pay taxes. The regulations require a showing of reasonable cause even if undue hardship would be suffered." *Nasir v. Commissioner*, T.C. Memo. 2011-283, 2011 WL 6029936, at \*6. When a taxpayer faces competing financial obligations, the governing Treasury Regulations "clearly require a factual assessment of the taxpayer's financial situation to

**[\*20]** determine whether it has exercised ordinary business care and prudence in responding to competing financial obligations." *Fran Corp. v. United States*, 164 F.3d 814, 819 (2d Cir. 1999); *cf. Kennedy v. United States*, 542 F. Supp. 1046, 1049 (D.N.H. 1982) (finding a lack of reasonable cause where there was no effort to show "what the assets and liabilities of the parties were as of the due date of payment"). A taxpayer involved in a divorce proceeding should ordinarily "explain[] how his divorce proceeding excused his failures to satisfy his tax obligations." *Kelly v. Commissioner*, T.C. Memo. 2022-73, at \*6. A taxpayer's assertion that he spent all of his money in a year in which he obtained a divorce, standing alone, is not reasonable cause for the failure to pay income tax timely. *See Joubert v. Commissioner*, T.C. Memo. 2007-292, slip op. at 3, 11. We may take into account the extent of the taxpayer's efforts to borrow to pay the tax liability. *See Estate of Hartsell*, T.C. Memo. 2004-211, slip op. at 20.

A taxpayer's illness or disability may constitute reasonable cause if there is a nexus between the illness or disability and the taxpayer's noncompliance and if the taxpayer otherwise used ordinary business care and prudence in attempting to meet his tax obligations. *See Erickson v. Commissioner*, 172 B.R. 900, 909–10 (Bankr. D. Minn. 1994) (finding reasonable cause for a quadriplegic taxpayer's failure to file and timely pay where the taxpayer provided information to an agent and monitored the agent's compliance, but the agent nonetheless failed to carry out the taxpayer's obligations timely); *cf. Williams v. Commissioner*, 16 T.C. 893, 906 (1951) (finding a lack of reasonable cause where the nexus between the taxpayer-husband's impairment and the taxpayers' failure to file their tax returns on the due dates was unclear).

Resolution of this case does not require us to hold that taxpayers facing a genuine choice between satisfying court-ordered payments in a divorce proceeding or satisfying their income tax obligations timely should prioritize the latter over the former or vice versa. *See Russell v. Commissioner*, 2011 WL 1314673, at \*8 n.9 ("Financial hardship is a defense unique to the failure to pay addition to tax."). Instead, we find that Dr. Shapiro has not established, by way of either his contemporaneous actions or his explanations in this case, that he used ordinary business care and prudence in responding to his competing financial obligations.

Dr. Shapiro faced various personal and financial difficulties during the years at issue. Nonetheless, the touchstone of our analysis

**[*21]** is whether the taxpayer faces undue hardship or an inability to pay despite exercising "ordinary business care and prudence in responding to competing financial obligations." *Fran Corp.*, 164 F.3d at 819. Dr. Shapiro's actions to ensure that his tax liabilities for the years at issue were paid timely essentially amount to protesting OCOA's decision to require spine surgeons to become in-network providers and requesting a decrease in his court-ordered payments from the family court.[20] Dr. Shapiro also made some payments toward his 2014 income tax liabilities after the conclusion of his divorce case and before the payment due date. Furthermore, unlike Appeals, we conclude that Dr. Shapiro's compliance history with respect to taxable years other than the years at issue merits no weight; the events occurring during the years at issue were relatively unusual and sufficiently distinguish the years at issue from other taxable years.

What the record is lacking, however, is evidence that Dr. Shapiro took actions that an ordinarily prudent taxpayer facing financial difficulties would have taken to ensure timely tax payment, or even that he considered taking such actions. *Cf. Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946) (stating that the failure of a party to introduce evidence that, if true, would be favorable to him gives rise to the presumption that, if produced, it would be unfavorable), *aff'd*, 162 F.2d 513 (10th Cir. 1947). By way of illustration, there is no indication in the record that Dr. Shapiro ever:

- requested an extension of time for the payment of tax, *see* § 6161;

- submitted an installment agreement request to the IRS, *see* § 6159;

- was in the practice of setting amounts aside for the payment of his tax besides making sporadic estimated tax payments;

- sought out legitimate borrowing sources, such as banks, credit card companies, or others who might have been willing to lend to

---

[20] The record also discloses that during the pendency of the divorce, Dr. Shapiro credibly told the family court that "I have not taken any vacations (except to Florida to visit my mother). I have not been able to maintain two vehicles (I previously also leased a Porsche) and I have been forced to take a leave of absence from my Country Club." We acknowledge these actions on Dr. Shapiro's part but find them to be relatively insubstantial under the circumstances here.

**[\*22]** him, before failing to pay his tax timely or even within a reasonable time thereafter;[21]

- petitioned the family court for permission to liquidate assets to pay delinquent tax liabilities;

- explored whether he could have supplemented his income from sources in addition to, or in lieu of, OCOA; or

- explored whether bankruptcy could have provided a restructuring of his tax or other obligations.[22]

These actions or others may have provided only a partial solution, and some of them may have been ineffective under the circumstances at improving his ability to pay. Nonetheless, it is imperative that when a taxpayer unilaterally extends himself a de facto loan from the government on account of his own financial circumstances, he has adequately explored the available alternatives and taken those that are appropriate. The United States Treasury is not a taxpayer's personal line of credit, or at least one of first resort. Dr. Shapiro has the burden to develop the record adequately to show that he has appropriately used it as such, but he has not done so. Any suggestion that the family court did not take Dr. Shapiro's outstanding tax liabilities into account is also unsupported by the record: The family court clearly did so when setting the amount of interim maintenance.

While we place primary emphasis on Dr. Shapiro's contemporaneous actions to address his tax obligations timely, his delay in addressing his outstanding income tax obligations until 2022 has also been inadequately explained in the light of the 2019 settlement he reached in relation to his insurance coverage from Lloyd's of London. There may be a reasonable explanation for the delay, but we have not been provided with it. In the absence of such an explanation, the delay casts further doubt on the nexus between his divorce and declining income during the years at issue and his failure to timely pay his income tax.

---

[21] A pair of transfers from June Shapiro in 2015 and 2016 is a possible exception to this statement, but it is unclear what the purpose of the transfers was or to what use Dr. Shapiro put them.

[22] Under certain conditions, section 6658 provides relief from additions to tax under sections 6651, 6654, and 6655 for failure to make timely tax payments during the pendency of a bankruptcy action. *See generally* Rev. Rul. 2005-9, 2005-1 C.B. 470.

**[\*23]** Dr. Shapiro relies heavily on the family court's order prohibiting the sale or liquidation of the Shapiros' assets, which was in effect from April 8, 2011, to February 14, 2014. On brief, Dr. Shapiro and respondent have each provided separate cashflow analyses for each year at issue[23] that purport to show whether Dr. Shapiro's OCOA distributions alone gave him the means to pay his federal income tax given his other expenses, many of which were court ordered.

As a threshold matter, the payment due dates for 2013–15 occurred after February 14, 2014, so we cannot determine Dr. Shapiro's ability to pay for those years without an accounting of his assets; a cashflow analysis alone is insufficient. *Cf. Kennedy*, 542 F. Supp. at 1049. Furthermore, neither party's cashflow analysis shows whether Dr. Shapiro could have reduced his expenses, increased his income, or otherwise provided for the payment of his tax through the exercise of ordinary business care and prudence. In the absence of (1) substantiation of Dr. Shapiro's assets on the payment due dates for 2013–15 and (2) the exercise of ordinary business care and prudence on Dr. Shapiro's part, the parties' cashflow analyses are misdirected.[24] It bears emphasizing that Dr. Shapiro has left the record significantly underdeveloped in this regard.

Furthermore, even taken on their own terms, Dr. Shapiro's cashflow analyses are significantly flawed. First, many of the expenses are unsubstantiated, and none of them are supported by citations of the record. Second, the analysis for 2015 uses an erroneously low figure for Dr. Shapiro's cash inflows ($620,000 instead of $878,000). Third, Dr. Shapiro's payments to his own attorneys (as well as other, poorly explained expenses such as "Miscellaneous Expenses" or "Laundry") were not court ordered and do not take precedence over his federal income tax obligations; therefore, they should not have been subtracted from the amount he could pay.

Fourth, the analyses assume that Dr. Shapiro's payments toward his substantial 2011 income tax obligations are properly subtractable

---

[23] Respondent has also provided a cashflow analysis for 2011.

[24] The parties' cashflow analyses also erroneously account for Dr. Shapiro's net cashflow only as of the close of each year at issue, not as of the payment due date for each year at issue. *Cf.* Treas. Reg. § 301.6651-1(c)(1) ("A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if he paid on the due date.").

**[\*24]** from the amount he could pay for the years at issue. This assumption is without merit and represents a sleight of hand. For purposes of calculating his ability to pay, and under the circumstances here, his payments toward his 2011 tax liabilities in 2012 are properly subtractable from his 2011 OCOA distributions, not his 2012 OCOA distributions. In determining whether a taxpayer has exercised ordinary business care and prudence, we take into account the nature of the tax which the taxpayer has failed to pay. *See* Treas. Reg. § 301.6651-1(c)(2). The income tax is a tax imposed on taxable income. *See generally* § 1. Taxable income is computed on the basis of the taxpayer's taxable year. *See* § 441(a). Attributing the 2011 income tax payments to Dr. Shapiro's 2012 taxable year creates the appearance, but not the reality, of an inability to pay during the years at issue by making it appear that Dr. Shapiro was required to support five years of income tax obligations (2011–15) on only four years of income (2012–15).

We might be more favorably disposed to such an attribution had Dr. Shapiro also shown reasonable cause for his failure to timely pay or make required estimated tax payments for 2011; nonetheless, the only reason we can discern for these failures is Dr. Shapiro's unjustified failure to save enough money to account for them. Unreasonably delaying the required 2011 payments until, and unreasonably attributing them to, the years at issue creates the appearance of an inability to pay during the years at issue but not the reality of it. Dr. Shapiro has not shown that he lacked the means to pay the 2011 tax timely out of his 2011 OCOA distributions, and respondent's well-documented 2011 cashflow analysis clearly suggests that he had the means to do so.

We also fail to see how section 6651(a)(2) can be read to permit Dr. Shapiro to stop an addition to tax from accruing for both his 2011 taxable year (through actual payment) and a year at issue (through reasonable cause) even though he made a payment only toward 2011. If he had instead elected to apply the same payments against his liabilities for the years at issue while leaving his 2011 balance outstanding, the addition to tax for failure to timely pay that respondent assessed against him for 2011 would not have stopped accruing. *Cf. Dixon v. Commissioner*, 141 T.C. 173, 185 (2013) (stating that a taxpayer generally may "designate how voluntary tax payments should be applied" by the IRS). We decline to attribute Dr. Shapiro's payments toward his 2011 tax liability, which are properly viewed as coming out of his 2011 OCOA distributions, to his 2012 taxable year.

[*25] Finally, despite all their flaws, Dr. Shapiro's own cashflow analyses show that he had positive net cashflow for 2012 and 2015. Dr. Shapiro has failed to explain why the positive net cashflow that he calculated for 2012 did not result in timely payment of his tax liability, and he explains the failure to timely pay any amounts for 2015 only by reference to his disability, which we discuss further (and reject as a ground for reasonable cause) below.

Respondent's cashflow analyses are well substantiated and make some generous assumptions in Dr. Shapiro's favor. Nonetheless, even if we permitted Dr. Shapiro to use them to attempt to meet his own burden of proof, they would not avail him. Despite Dr. Shapiro's failure to substantiate his living expenses, respondent has permitted allowances determined by reference to the IRS's allowable living expense standards. Respondent has also allowed Dr. Shapiro to subtract his actual attorney's fees in the divorce action from his ability to pay, despite the lack of a court order requiring them. Overall, despite their assumptions in Dr. Shapiro's favor, respondent's cashflow analyses give rise to the conclusion that Dr. Shapiro had sufficient cashflow to pay substantially more of his income tax obligations timely than he actually did, especially after accounting for the substantial 2011 income tax payments that he made during the years at issue.

Dr. Shapiro also cites the disabling condition that he developed on August 18, 2015, as reasonable cause for his failure to timely pay his income tax. This disability cannot establish reasonable cause for his 2012–14 taxable years because it occurred after the payment due dates for all of them, although it is relevant to his assertion of reasonable cause for his 2015 taxable year. Nonetheless, Dr. Shapiro has not shown reasonable cause for the untimely payment of his 2015 income tax obligation, even considering his disability. He has not explained whether his disability resulted in increased expenses or physical difficulties relevant to the payment of his tax obligation, or merely reduced his income (and his corresponding income tax obligation) for 2015. Neither has he accounted for the assets or sources of borrowing available to him as of the payment due date for his 2015 taxable year or explained why he failed to make required estimated tax payments before August 18, 2015. *Cf.* § 6654(c)(2) (requiring estimated tax payments on, inter alia, April 15 and June 15 of the taxable year). The record leaves us unsure of:

- the extent of his efforts to collect from private or Social Security disability insurance;

[*26] • whether Dr. Shapiro's testimony that "in 2016, I had disability insurance that started paying" refers to payments that he received before or after the payment due date for his 2015 taxable year;

• the amount and timing of the disability payments he received from Guardian Life Insurance;[25]

• whether he had additional disability coverage through an insurer other than Lloyd's of London or Guardian Life Insurance;

• whether his rights of recovery against Lloyd's of London could have been used as collateral to support borrowing as of the payment due date for his 2015 taxable year; and

• the cause of the delay between his recovery from Lloyd's of London in 2019 and his payment toward his 2013–15 income tax obligations in April 2022.

Dr. Shapiro has failed to carry his burden to show that the disabling condition he developed in 2015 provides reasonable cause for any of the years at issue.

Dr. Shapiro argues that a number of cases provide support for his position, including *East Wind Industries, Inc. v. United States*, 196 F.3d 499 (3d Cir. 1999); *Custom Stairs & Trim, Ltd. v. Commissioner*, T.C. Memo. 2011-155; *Glenwal-Schmidt v. United States*, No. 77-0902, 1978 U.S. Dist. LEXIS 16635 (D.D.C. July 12, 1978); and *In re Pool & Varga, Inc.*, 60 B.R. 722 (Bankr. E.D. Mich. 1986). These cases, whose facts are highly dissimilar to the facts here, involved businesses that faced a real choice between serious financial hardship or timely depositing and paying employment taxes. The taxpayers in these cases

---

[25] The record discloses that Mrs. Shapiro unsuccessfully attempted to garnish disability payments made to Dr. Shapiro by Guardian Life Insurance. Guardian Life Insurance sent a letter to Dr. Shapiro, Mrs. Shapiro, and their respective counsel dated June 16, 2016, denying the attempted garnishment on the grounds of an exemption applicable to disability payments under New York law. Dr. Shapiro testified that his understanding of the letter was that the money he received from Guardian Life Insurance "wasn't [to be used] to satisfy debts and liens, including the taxation services, IRS." We reject his testimony as incredible and his interpretation of the letter as patently unreasonable. The letter discusses only an exemption from garnishment or execution and does not refer to any limitation on his own disposition of the funds or to his tax obligations. In any case, a letter from Guardian Life Insurance does not constitute legal advice.

**[\*27]** demonstrated that they faced undue hardship or an inability to pay despite the exercise of ordinary business care and prudence. Dr. Shapiro has proven neither the exercise of ordinary business care and prudence nor an inability to pay or the prospect of undue hardship.

### B. *Section 6654*

Section 6654(a) imposes an addition to tax on an individual who underpays his estimated tax. This addition to tax is calculated with reference to four required installment payments of the taxpayer's estimated tax liability. § 6654(c) and (d). Each required installment is equal to 25% of the "required annual payment." § 6654(d). The required annual payment is equal to the lesser of (1) 90% of the tax shown on the return for the taxable year (or, if no return is filed, 90% of the tax for such year) or (2) if the individual filed a return for the immediately preceding taxable year, 100% (or, in certain circumstances, 110%) of the tax shown on the return of the individual for the preceding taxable year. § 6654(d)(1)(B) and (C); *see Wheeler*, 127 T.C. at 210–11. The due dates of the required installments for a calendar year taxpayer are April 15, June 15, and September 15 of the calendar year in question and January 15 of the following year. § 6654(c)(2).

The Commissioner's burden of production under section 7491(c) requires him to produce, for each year for which the addition to tax is asserted, evidence that the taxpayer had a required annual payment under section 6654(d). *See Wheeler*, 127 T.C. at 211–12. To do so, the Commissioner must establish the tax shown on the taxpayer's return for the immediately preceding taxable year or demonstrate that the taxpayer filed no such return. *See id.*; *Harvey v. Commissioner*, T.C. Memo. 2023-95, at *6–7. The parties have stipulated the amount of tax shown on each of Dr. Shapiro's income tax returns for the years at issue, and a Form 1040 for Dr. Shapiro's 2011 taxable year showing the amount of tax owed is in the record.[26] Respondent has met his burden of production to show that Dr. Shapiro had a required annual payment under section 6654(d) for each year at issue.

Section 6654 does not include a general exception for reasonable cause or lack of willful neglect. *See* Treas. Reg. § 1.6654-1(a)(1) ("This addition to tax . . . is imposed whether or not there was reasonable cause for the underpayment."); *see also Rader v. Commissioner*, 143 T.C. 376,

---

[26] The 2011 Form 1040 is in the record as an attachment to Dr. Shapiro's February 21, 2013, family court affidavit.

**[\*28]** 390 (2014), *aff'd in part, appeal dismissed in part*, 616 F. App'x 391 (10th Cir. 2015); *Collins v. Commissioner*, T.C. Memo. 2020-50, at \*47–48. Nonetheless, no addition to tax is imposed under section 6654(a) with respect to any underpayment "to the extent the Secretary determines that by reason of casualty, disaster, or other unusual circumstances the imposition of such addition to tax would be against equity and good conscience." § 6654(e)(3)(A). Furthermore, no addition to tax is imposed under section 6654(a) if the Secretary determines that the taxpayer became disabled in either the taxable year for which estimated income tax payments were required or in the preceding taxable year and the underpayment was due to reasonable cause and not willful neglect. *See* § 6654(e)(3)(B).

For the same reasons that we find that the disabling condition Dr. Shapiro developed on August 18, 2015, does not provide reasonable cause for his failure to timely pay his income tax for any of the years at issue, we also find that it does not provide reasonable cause for his underpayment of estimated tax for the years at issue. Dr. Shapiro argues that after he became disabled he "did not pay his net cashflow to the IRS for fear that he would not have any monies by which to pay his living expenses and the matrimonial order." Nonetheless, his bank account statements show that he did not strictly conserve his cashflow for living expenses and tax payments after he became disabled and before the payment due date for his 2015 taxable year. *Cf. Zaimes v. Commissioner*, T.C. Memo. 2023-121, at \*28–29 (finding, pursuant to section 6151(a), that a calendar year taxpayer's tax payment for his 2015 taxable year was due on April 18, 2016). For example, there are unexplained charges or withdrawals of (1) $500 at an automated teller machine in Beverly Hills, California, on October 16, 2015, (2) $314 for "EN JAPANESE BRASSIRE" in New York, New York, on March 1, 2016, (3) $303 for "GOLDEN RULE WINE AND L" in New York, New York, on March 29, 2016, and (4) $1,630 for "THE SETAI HOTEL" in Miami Beach, Florida, on April 14, 2016. Dr. Shapiro has not proven that an exception to the section 6654 addition to tax applies for any of the years at issue. We also find specifically that, for the same reasons that his divorce, declining income, and disability do not constitute reasonable cause for his failure to timely pay his income tax, it is not against equity and good conscience to impose the section 6654 addition to tax for any of the years at issue.

**[\*29]** III.  *Abuse of Discretion*

The only remaining question is whether AO Armenia abused her discretion in sustaining the proposed levy to collect Dr. Shapiro's unpaid tax liabilities for the years at issue.  Dr. Shapiro has not advanced any argument on brief that respondent's determinations concerning nonliability issues are inappropriate.  We therefore deem him to have abandoned any argument that sustaining the proposed levy was an abuse of discretion by AO Armenia.  *See Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned.").

Nonetheless, even if we construe Dr. Shapiro's general objection to the levy in his petition as an argument that AO Armenia abused her discretion in determining that a levy is appropriate, we would still conclude that there was no abuse of discretion here.  To determine whether an abuse of discretion occurred, we review the record to determine whether AO Armenia (1) properly verified that the requirements of applicable law and administrative procedure have been met; (2) considered any relevant issues that Dr. Shapiro raised; and (3) considered whether the proposed levy balances the need for the efficient collection of taxes with Dr. Shapiro's legitimate concern that any collection action be no more intrusive than necessary.  *See* § 6330(c)(3); *Lunsford v. Commissioner*, 117 T.C. 183, 184 (2001); *Ludlam v. Commissioner*, T.C. Memo. 2019-21, at \*9–10, *aff'd per curiam*, 810 F. App'x 845 (11th Cir. 2020).

Our review of the record shows that AO Armenia properly verified that all applicable legal and administrative requirements were met.[27] Currently not collectible status was inappropriate because Dr. Shapiro reported that he had liquid assets valued at over $8 million and that his only liability related to his purchase or lease of a $200,000 Mercedes automobile.[28]  *See Am. Limousines, Inc. v. Commissioner*, T.C. Memo. 2021-36, at \*15 ("[A] settlement officer's denial of currently not collectible status is not an abuse of discretion where the taxpayer lacks

---

[27] The supervisory approval requirement of section 6751(b)(1) does not apply to the additions to tax at issue because they were additions to tax under sections 6651 and 6654.  *See* § 6751(b)(2)(A); *Ludlam*, T.C. Memo. 2019-21, at \*10 n.4.

[28] Furthermore, it is not an abuse of discretion for Appeals to reject a collection alternative where a taxpayer is not in compliance with his ongoing tax obligations.  *See Cox v. Commissioner*, 126 T.C. 237, 257 (2006), *rev'd on other grounds*, 514 F.3d 1119 (10th Cir. 2008); *Hull v. Commissioner*, T.C. Memo. 2015-86, at \*15.  Dr. Shapiro has not demonstrated that he is in compliance with his ongoing tax obligations.

[*30] sufficient income to pay its tax debt but owns assets that could be liquidated to provide funds to satisfy that debt.").  In the absence of a proposed collection alternative other than currently not collectible status, AO Armenia did not err in determining that the proposed levy appropriately balanced the need for efficient collection of taxes with Dr. Shapiro's legitimate interest that the collection action be no more intrusive than necessary.  *See, e.g.*, *Roberts v. Commissioner*, T.C. Memo. 2021-131, at *8 ("It is not an abuse of discretion to decline to consider something that was never proposed."); *cf. Chavis v. Commissioner*, 158 T.C. 175, 186 (2022) ("The only collection alternatives [the taxpayer] proposed, in her . . . hearing request or subsequently, were to have her account placed in [currently not collectible] status and to have the [notice of federal tax lien] withdrawn. . . . [The taxpayer] is free to submit to the IRS at any time, for its consideration and possible acceptance, a collection alternative in the form of an installment agreement or an offer-in-compromise, supported by up-to-date financial information . . . .").

IV.    *Conclusion*

Finding no merit to Dr. Shapiro's challenge to his underlying tax liabilities, and finding no abuse of discretion by AO Armenia, we affirm respondent's determination to sustain the proposed collection action.

We have considered all of the parties' arguments and, to the extent they are not discussed herein, find them to be irrelevant, moot, or without merit.

To reflect the foregoing,

*An appropriate decision will be entered.*